[Cite as *Camara v. Ohio State Univ. Med. Ctr. E.*, 2015-Ohio-5554.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

AHMED CAMARA, Admr.

     Plaintiff

     v.

THE OHIO STATE UNIVERSITY MEDICAL CENTER EAST

     Defendant

Case No. 2013-00030

Magistrate Holly True Shaver

DECISION OF THE MAGISTRATE

{¶1} Plaintiff, Ahmed Camara, brought this action as administrator of the estate of his wife, Patreace Spruiel-Camara, alleging wrongful death. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} On July 28, 2009, Camara[1] who was 29 years old, presented to defendant's Emergency Room (ER) complaining of "9 out of 10 bone pain" due to sickle cell disease, a genetic blood disorder that causes frequent episodes of pain referred to as "pain crises." According to Camara's medical records, between 2003 and 2009, she was seen in defendant's ER approximately 60 times for sickle cell pain crises.

{¶3} Camara arrived at the ER at 7:38 p.m., and was seen by nursing staff in triage. Camara was thereafter evaluated by Ann Haynes, M.D., the attending physician. Dr. Haynes had previously treated Camara for pain crises, but she was not Camara's primary care physician. Dr. Haynes took Camara's history and performed an examination. Dr. Haynes ordered a chest x-ray, bloodwork, and a urinalysis, and started Camara on intravenous pain medication and normal saline. Approximately two hours later, Camara reported her pain level had decreased to "5 out of 10" and she was

---

[1]"Camara" shall be used to refer to Patreace Spruiel-Camara throughout this decision.

discharged home with written instructions to return to the hospital if certain changes in her condition occurred.   Camara was also instructed to schedule a follow-up appointment with her hematologist, Ahmed Ghany, M.D. as soon as possible.   Camara left the hospital at approximately 10:20 p.m., and drove to the home of her aunt Marilyn Cole.   After watching a movie, Camara spent the night at Cole's home.   The next morning, Cole found Camara unresponsive.   Medics were called to the scene and Camara was pronounced dead.   An autopsy was performed and the coroner determined that the cause of death was "massive sickling of red blood cells due to sickle cell disease."   (Exhibit 1 to deposition of Jan Gorniak, D.O.)

{¶4} Plaintiff asserts that defendant, through Dr. Haynes' treatment of Camara, failed to meet the standard of care when she did not admit Camara to the hospital for additional care.   Specifically, plaintiff asserts that Dr. Haynes failed to adequately hydrate Camara, failed to order additional follow-up testing of her blood, failed to consult Dr. Ghany, failed to admit her for further care, including a blood transfusion, and failed to diagnose and treat a urinary tract infection (UTI).

{¶5} In order to prove negligence, plaintiff must prove the existence of duty and a breach of such duty, which proximately causes damages.   *Armstrong v. Best Buy Co., Inc.*, 99 Ohio St.3d 79, 2003-Ohio-2573.   "To maintain a wrongful death action on a theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death."   *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 92 (1988). Similarly, "[i]n order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions   and

circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976), paragraph 1 of the syllabus. Proof of the recognized standards of care must be provided through expert testimony. *Id.* at 131-132.

{¶6} Ann Haynes, M.D., who is board certified in emergency medicine, testified that she has been employed by defendant as a clinical assistant professor of medicine since 1999 and is familiar with sickle cell disease. Dr. Haynes' primary duty is patient care at defendant's hospital. Dr. Haynes testified that there are a number of recognized causes of sickle cell pain crises, such as stress, dehydration, extreme heat or cold, and infection. However, she also stated that often there is no identifiable precipitator. Dr. Haynes testified that the protocol when a patient presents with a sickle cell pain crisis is to identify the precipitator if possible and then treat the pain.

{¶7} Dr. Haynes testified that there are a variety of sickle cell crises, the most common of which is a pain crisis. An aplastic crisis is caused by an infection that prevents bone marrow from producing new red blood cells. A splenic sequestration crisis occurs most often in children, when red blood cells get trapped in the spleen.

{¶8} With regard to the treatment that she provided to Camara on July 28, 2009, Dr. Haynes testified that Camara arrived at the ER at 7:38 p.m., and was triaged by a nurse. Camara's blood pressure was 115 over 76, which Dr. Haynes stated is a normal reading for a woman. Dr. Haynes examined Camara at 7:50 p.m., at which time Dr. Haynes obtained Camara's history, ordered a chest x-ray, and ordered a number of tests, including a complete blood count (CBC), electrolytes, liver panel, urine, urine pregnancy test, and a reticulocyte count which is another measurement of the blood. Dr. Haynes also ordered IV fluids of normal saline, IV medications including Benadryl for itching, Dilaudid for pain, and Zofran for nausea. The medical records show that Camara was given approximately 400 ccs of normal saline during her ER visit, which is approximately one half of a liter. Dr. Haynes also ordered a chest x-ray

to rule out acute chest syndrome, a leading cause of death in sickle cell patients. Dr. Haynes testified that the chest x-ray was normal and showed no evidence of acute chest syndrome.

{¶9} Dr. Haynes agreed that dehydration can precipitate a crisis, but stated that based upon Camara's clinical presentation, she did not believe that Camara was significantly dehydrated. Dr. Haynes noted that Camara's mucous membranes and her tongue were moist, and that Camara had no complaints of vomiting or diarrhea. With regard to Camara's bloodwork, Dr. Haynes testified that Camara's hemoglobin level was low but consistent with her normal range from previous tests performed during her prior visits to the hospital. Dr. Haynes testified that Camara's bone marrow was producing reticulocytes, which are immature red blood cells, and therefore, Camara was not suffering from an aplastic crisis. Dr. Haynes testified that a blood transfusion was not warranted because Camara was not exhibiting signs of anemia, such as shortness of breath, and that there was no reason to order follow up bloodwork.

{¶10} Dr. Haynes testified that during her examination, she asked Camara specific questions to determine whether she had any symptoms of a UTI, but that Camara's answers to those questions led to the conclusion that she did not. Specifically, Camara denied any history of fever, flank, or bladder pain. Dr. Haynes testified that she ordered a urinalysis to screen for pregnancy (which can be a problem for sickle cell patients), assess for hydration, and screen for infection. Dr. Haynes testified that two urine tests were conducted: a dipstick test, which gives an instant reading; and, a microscopic urinalysis, which is sent to the lab and typically takes 30 to 40 minutes to process. Although Dr. Haynes could not remember specifically reviewing the results of the microscopic urinalysis, and admitted that her notes do not reference that she did so, she testified that typically in her practice, the results of the microscopic urinalysis are attached to the front of a patient's file and would have been

available to her before she ordered that Camara be discharged from the hospital. Dr. Haynes testified that the results of both urine screens support her conclusion that Camara was not suffering from a UTI on July 28, 2009.

{¶11} Finally with regard to her decision to discharge Camara from the ER, Dr. Haynes testified that if Camara's pain had not improved, if she were dehydrated, if she showed signs of a significant infection, had anemia and would have needed a transfusion, or if she had been suffering from an aplastic crisis, Dr. Haynes would have admitted Camara to the hospital. However, Dr. Haynes testified that none of those scenarios occurred in this case. In Dr. Haynes' opinion, Camara presented with an uncomplicated sickle cell pain crisis which did not require her to consult Dr. Ghany.

{¶12} Plaintiff presented the deposition testimony of Jan Gorniak, D.O., the Franklin County coroner at the time of Camara's death. Although Dr. Gorniak did not conduct the autopsy herself, she testified that the cause of death was listed as "massive sickling of red blood cells as a consequence of sickle cell disease." Dr. Gorniak testified that during a forensic autopsy, a UTI is not something that a pathologist would document or look for, so the lack of documentation of a UTI is not dispositive of whether plaintiff's decedent had a UTI at the time of her death.

{¶13} Plaintiff also presented the deposition testimony of George Shaw, M.D., who is employed as an associate professor of emergency medicine at the University of Cincinnati, and is board certified in emergency medicine. Dr. Shaw described a sickle cell crisis as an acute sickling of red blood cells, which results in sickled red blood cells becoming lodged in the small blood vessels of the body, and slowing down or preventing blood flow to tissues and organs. Dr. Shaw reviewed Camara's medical records and stated that Dr. Haynes ordered the appropriate tests when Camara presented to the ER. Dr. Shaw testified that a normal hemoglobin value is 15 and that Camara's hemoglobin level was 7.1. Dr. Shaw stated that even though sickle cell patients have blood values that reflect anemia, 7.1 was "on the low side for [Camara]."

(Plaintiff's Exhibit 2, p. 19.)   Dr. Shaw stated that although Dr. Haynes gave Camara 400 milliliters of fluid, he would have given at least twice that amount.

{¶14} With regard to the urinalysis, Dr. Shaw stated that Camara's urine tested positive for nitrites, contained one to two white blood cells, and tested positive for the presence of bacteria.   Dr. Shaw stated that those findings elevate the chance that Camara was suffering from a UTI.   Dr. Shaw stated that infections in sickle cell patients can be very serious, and that an infection can ultimately result in a massive sickling of cells.   According to Dr. Shaw, the medical records show the results of the microscopic urinalysis, but there is no indication that Dr. Haynes reviewed the lab results or made a notation that the urine tested positive for nitrites and bacteria.   Dr. Shaw testified that he would have started Camara on an antibiotic and sent her urine to be cultured to rule out a UTI.   Dr. Shaw opined that the standard of care required that Camara be admitted to the hematology/oncology service based upon her presentation on July 28, 2009.   Dr. Shaw opined that Dr. Haynes failed to recognize that Camara was suffering from a UTI; that Dr. Haynes failed to recognize and treat how anemic Camara was in that she very likely required a blood transfusion; and that Dr. Haynes did not administer enough fluids to Camara.   Dr. Shaw believed that a UTI was the cause of Camara's pain crisis and that it was left untreated when she was discharged from the ER.   Dr. Shaw opined that if Camara had been admitted and treated for all of her symptoms, she more likely than not would have been restored to her baseline and would not have died.

{¶15} Dr. Shaw conceded that if a patient has an elevated level of bilirubin in the blood, that condition can cause urine to become orange in color and can cause a false positive for nitrites on a urinalysis.   Dr. Shaw also testified that Camara's white blood cell count was within normal limits.   Dr. Shaw agreed that Camara was not having an aplastic crisis because she had an elevated level of reticulocytes.   Dr. Shaw agreed that the chest x-ray that was taken in the ER did not show fluid or congestion in

Camara's lungs, although the autopsy showed that there was fluid in her lungs.   Dr. Shaw stated that Camara's immune system was compromised because she suffered from sickle cell disease, that her hemoglobin and hematocrit levels were low even for her, and that her presentation was highly suspicious for a UTI.   According to Dr. Shaw, based on those conditions, she should have been admitted to the hospital for a blood transfusion.   Dr. Shaw criticized Dr. Haynes for failing to consult Camara's hematologist and for her failure to diagnose and treat a UTI.

{¶16} Plaintiff's final expert witness, Robert Sklaroff, M.D., testified via deposition that he is board certified in internal medicine, medical oncology, and independent medical examinations.   Although his specialty is medical oncology/hematology, Dr. Sklaroff is not board certified in hematology because he did not pass the board certification test.   Dr. Sklaroff testified that Camara was undergoing a sickle cell pain crisis based upon a drop in her hemoglobin level and a rise in her reticulocyte count.   Dr. Sklaroff also noted that Camara had increased levels of bilirubin, which is a breakdown product of the hemoglobin molecule.   Dr. Sklaroff testified that Camara's urinalysis results were abnormal based upon the presence of nitrites, white blood cells, and bacteria.   According to Dr. Sklaroff, if a sickle cell patient shows signs of infection, a urine culture should be taken and the patient should be placed on antibiotics because an infection can trigger or perpetuate a sickle cell pain crisis.   Dr. Sklaroff testified the Camara's hemoglobin level of 7.1 was not normal, even for her, based upon her past hospital visits.   Dr. Sklaroff also testified that a normal level of reticulocytes is 1 percent and Camara's was 14.2 percent, which he described as very high.

{¶17} Dr. Sklaroff testified that despite the fact that Camara was given IV fluids to hydrate her, her blood pressure should have increased but it decreased instead.   Dr. Sklaroff testified that Camara was very dehydrated upon presentation to the ER.   Dr. Sklaroff reviewed Camara's prior hospitalizations for sickle cell crises and stated that in the past, when her hemoglobin was approximately 7.1, and her reticulocyte count was

approximately 14 percent she was admitted to the hospital. However, during her visit to the ER under Dr. Haynes' care, no follow up bloodwork or urine culture was ordered, and Camara was discharged without being prescribed antibiotics. Dr. Sklaroff added that there is nothing in the medical record to show that Dr. Haynes reviewed the results of the microscopic urinalysis prior to discharging Camara. Dr. Sklaroff stated that if a physician orders a test, it is incumbent to evaluate the results of the test prior to discharging a patient. Dr. Sklaroff opined that Dr. Haynes should have ordered a second test for reticulocytes, hemoglobin, and a urine culture. Dr. Sklaroff testified that the results of those three tests would have led to Camara's admission to the hospital for a blood transfusion and additional management.

{¶18} On cross-examination, Dr. Sklaroff acknowledged that he does not serve as an attending physician in an emergency room; that he has not worked in an emergency room since his residency in the 1970's; and that he does not treat many sickle cell patients in his practice. Dr. Sklaroff testified that the presence of one to two white blood cells in Camara's urine suggests infection, the possibility of which should not have been dismissed in Camara's case, especially in conjunction with the nitrites and bacteria in her urine. Dr. Sklaroff was critical of Dr. Haynes' decision not to consult Dr. Ghany or to order a transfusion. Dr. Sklaroff conceded that it would have likely taken eight hours for the correct type of blood to be available for a transfusion based upon Camara's blood type, which was difficult to match. Dr. Sklaroff testified that Dr. Haynes should have placed Camara on antibiotics even though Camara did not have a fever or any classic signs of a UTI.

{¶19} Defendant presented the expert testimony of Martin Steinberg, M.D., via deposition, a professor at Boston University School of Medicine who is board certified in internal medicine and hematology. Dr. Steinberg has treated patients with sickle cell disease for approximately 45 years and has headed the Center of Excellence in Sickle Cell Disease at Boston University since 2000. Dr. Steinberg defined sickle cell disease

as a genetic disorder of hemoglobin, the substance in red blood cells that carries oxygen from the lungs to the tissues of the body. Dr. Steinberg explained that when sickle hemoglobin becomes de-oxygenated, it forms a crystal structure in the cell. The crystal structure distorts the cell shape, and those distorted cells occlude blood vessels. When blood vessels are occluded, blood flow is impaired and tissue is damaged. The pain associated with a sickle cell crisis is caused by occluded blood vessels. Occlusions from sickle cells can result in strokes, bone damage, or acute chest syndrome, depending upon the location of the occlusion. Sickle cells are also short-lived cells. While normal red blood cells function for approximately four months, sickle cells function for approximately 5 to 10 days. Patients with sickle cell disease typically have a high reticulocyte count.

{¶20} Although he is not an ER doctor, Dr. Steinberg testified that when a patient presents complaining of a sickle cell pain crisis, the standard of care requires that the physician take a history from the patient to detect symptoms of dehydration or infection, and then take vital signs and do some basic laboratory testing such as a blood count to see what to do next. Dr. Steinberg stated that Dr. Haynes noted that there were no abnormal findings on physical examination. Camara had no shortness of breath, complaints of coughing or abdominal pain, fever, chills, or sweats, and no signs of abnormal or painful urination. Dr. Steinberg noted that Camara did not present with clinical signs of dehydration, such as tachycardia, hypotension, dry mucous membranes, or poor skin turgor. Dr. Steinberg stated that Camara's vital signs upon arrival were within a normal range. Camara's vital signs on discharge were also normal and her pain level had decreased from 9 out of 10 at admission to 5 out of 10.

{¶21} According to Dr. Steinberg, Camara's hemoglobin level of 7.1 was consistent with her levels from prior hospital visits, which ranged from 6.5 to 8.2. Camara's hematocrit level of 21.1 was also consistent with her previous results. Dr. Steinberg testified that since her hemoglobin and hematocrit numbers were consistent

with her baseline numbers, there was no need to consult Dr. Ghany.   Dr. Steinberg also testified that Camara's clinical presentation did not warrant a transfusion.

{¶22} Dr. Steinberg explained that a reticulocyte count is a measurement of the production of new red blood cells by the patient's bone marrow.   A normal reticulocyte count for a person without sickle cell disease is less than 1 percent.   However, in sickle cell disease, the reticulocyte level is always elevated, because the body continually has to make new red blood cells.   Dr. Steinberg described Camara's reticulocyte count at 14 or 15 percent as consistent with her past readings and described it as chronic, as opposed to a sign of any acute event.   Dr. Steinberg added that a reticulocyte count of 14.2 was expected for Camara, and that he would be more concerned if it were very low as opposed to being very high.   Dr. Steinberg noted that Camara's reticulocyte count shows that she was not experiencing an aplastic crisis, which is when the bone marrow stops producing red blood cells, and the patient becomes very anemic very rapidly.

{¶23} Dr. Steinberg described bilirubin as the end product of the metabolism of hemoglobin which is metabolized in the liver and circulates through the bloodstream. Dr. Steinberg was not concerned with Camara's bilirubin level of 5.3, and noted that during her past ER visits, she had had levels between 4 and 8.   According to Dr. Steinberg, an increased bilirubin level is a natural consequence of sickle cell disease. With regard to the urinalysis, Dr. Steinberg noted that Camara's urine was clear, as opposed to being turbid or cloudy, although it had an orange color to it.   Dr. Steinberg explained that the orange color of the urine can be caused by bilirubin that is excreted into the urine from the kidneys.   Dr. Steinberg acknowledged that a positive test for nitrites can be an indication of bacteria in the urine.   However, he noted that urine with a high level of bilirubin more often than not results in a false positive test for nitrites. Dr. Steinberg also testified that the one or two white blood cells in Camara's urine was not significant for infection, in that it was within normal limits for a woman without an

attempt for a clean-catch urine sample. In Dr. Steinberg's opinion, neither the urinalysis nor Camara's clinical presentation showed evidence that she was suffering from a UTI.

{¶24} Although Dr. Steinberg acknowledged that the results of the microscopic urinalysis are not specifically mentioned in the discharge summary, he did not agree that the lack of a notation shows that Dr. Haynes did not review the results. According to Dr. Steinberg, upon Camara's discharge, she was stable and was given appropriate instructions to return if her condition worsened and to follow up with her hematologist. Dr. Steinberg opined that it was within the standard of care to discharge Camara after her treatment in the ER because her pain was managed and there was no need for any further type of evaluation.

{¶25} With regard to the cause of death, Dr. Steinberg opined that Camara suffered an acute event, either a lethal arrhythmia or sudden cardiac decompensation which prevented her from breathing and caused hypoxia, resulting in her death. Dr. Steinberg also stated that once the acute event occurred, Camara suffered a massive sickling of red blood cells because when patients with sickle cell disease are deprived of oxygen all of their red blood cells will sickle. Dr. Steinberg strenuously disagreed that the immediate cause of death was massive sickling. Dr. Steinberg based his opinion on the cause of Camara's death on research studies that show that there are three common sudden causes of death in sickle cell patients. One cause is a massive pulmonary embolism from necrotic bone marrow. According to Dr. Steinberg, it is clear from the medical records that Camara did not have a pulmonary embolism. However, Dr. Steinberg stated that he could not distinguish the cause of her death between a lethal arrhythmia and sudden cardiac decompensation. Dr. Steinberg stated that Camara also had pulmonary hypertension and myocardial disease which are conditions related to her sickle cell disease.

{¶26} Defendant's final expert witness was David Talan, M.D., who is board certified in internal medicine, emergency medicine, and infectious diseases. Dr. Talan has been the chief of the ER department for 21 years at Olive View UCLA Medical Center. Dr. Talan testified that he has managed patients with sickle cell disease in an ER setting. Dr. Talan opined that Dr. Haynes complied with the standard of care and made a reasonable decision to discharge Camara. Dr. Talan testified that a review of the medical record shows that Dr. Haynes asked the right questions, specifically regarding symptoms of infection; that she appropriately referenced Camara's history of hospitalizations regarding her treatment for sickle cell crises; that her physical exam of Camara was well-documented; and that she made proper notes of vital signs, ordered appropriate testing, and interpreted those tests correctly.

{¶27} With regard to Camara's hydration status, Dr. Talan testified that Camara was not significantly dehydrated, based upon her clinical presentation of having moist mucous membranes, and not complaining of diarrhea, vomiting, or an inability to take fluids. With regard to the results of the CBC, Dr. Talan testified that Camara's white blood cell count of 9.0 was in the normal range. Dr. Talan stated that if a patient's white blood cell count is higher than normal, that is a sign of infection. With regard to the urinalysis, Dr. Talan testified that the results do not show that Camara was suffering from a UTI. Specifically, Dr. Talan noted that Camara's urine was clear, despite it being orange in color. According to Dr. Talan, if a significant amount of bacteria and white blood cells were in her urine, the test result would have been "cloudy" instead of clear. The urinalysis also noted that there was no blood in Camara's urine, which is another indicator of infection. Most importantly, Camara's urine tested negative for leukocytes, which Dr. Talan described as the sine qua non of infection. Although Camara had one to two white blood cells in her urine, Dr. Talan testified that that amount is normal, and that an abnormal level would be 5 to 10 white blood cells. Dr. Talan also testified that although bacteria was present in Camara's urine, it was not a

reliable indicator of infection because the sample was not obtained through a clean catch. He agreed that elevated levels of bilirubin make urine appear orange, and that the orange color can signify the presence of nitrites. However, in this case, Dr. Talan opined that the positive finding of nitrites was not dispositive of infection, because of Camara's elevated level of bilirubin, which more often than not results in a false positive for nitrites. Dr. Talan also stated that there was no reason to order a urine culture because there was not enough evidence to suspect infection based upon the results of the urinalysis. In sum, Dr. Talan opined that there was no compelling evidence of either a UTI or any significant bacterial infection based upon either the results of the urinalysis or Camara's clinical presentation.

{¶28} Dr. Talan also opined that Camara's clinical presentation and the results of her blood tests did not warrant a blood transfusion. Dr. Talan agreed that Camara's reticulocyte count was abnormally high, but he considered that a good sign because it showed that her bone marrow was producing additional red blood cells. Dr. Talan also opined that Camara was experiencing a standard sickle cell pain crisis and that consultation with Dr. Ghany was not warranted. Dr. Talan testified that Camara's hemoglobin levels were not alarming and that they were within her normal range as a sickle cell disease patient. Dr. Talan further opined that the standard of care did not require Camara to be admitted to the hospital. In his opinion, Dr. Haynes understood Camara's condition and treated her appropriately. Dr. Talan also agreed that Camara was stable when she was discharged.

{¶29} Dr. Talan disagreed with Dr. Sklaroff's opinion that Camara's blood pressure had "dropped" prior to her discharge. Dr. Talan stated that Camara's vital signs were stable throughout her visit to the ER. Dr. Talan stated that there was no need for additional testing of Camara's blood because her blood count would not have been expected to change during her visit to the ER. In Dr. Talan's opinion, Camara

was having an uncomplicated sickle cell pain crisis that was treated appropriately by Dr. Haynes.

{¶30} With regard to the cause of death, Dr. Talan opined that Camara died as a result of an acute event, most likely an arrhythmia, because she suffered from chronic myocarditis. Dr. Talan agreed that a massive sickling at death is not unexpected in a sickle cell patient, but that the massive sickling would have naturally occurred after the acute event caused her heart to stop. Dr. Talan also found it significant that there was no evidence of infection on the autopsy.

{¶31} Upon review of the evidence, the magistrate finds that the testimony of defendant's medical experts was more persuasive than the testimony of plaintiff's medical experts. Based upon the testimony of Drs. Steinberg and Talan, the magistrate finds that Dr. Haynes' treatment and care of Camara met the applicable standard of care in all respects. The magistrate finds that Dr. Steinberg's experience in the field of sickle cell disease, and Dr. Talan's experience as an ER physician and his research in the field of infectious diseases lend greater credibility to their opinions that the standard of care was met in this case. In contrast, the magistrate finds that the testimony of Dr. Sklaroff, whose CV shows that his research is more focused in the field of oncology, who is not board certified in hematology, and has not practiced medicine in an ER setting since the 1970's, was not particularly persuasive regarding the standard of care for treatment of patients with sickle cell disease. The magistrate finds that defendant's experts clearly had superior knowledge of both sickle cell disease and infectious diseases in general. In sum, the magistrate finds that Dr. Steinberg and Dr. Talan's testimony that Camara was not suffering from a UTI on July 28, 2009 is credible and persuasive. The greater weight of the evidence support's defendant's theory that Camara did not have an active infection during her July 28, 2009 ER visit, and, therefore, that an untreated UTI was not the cause of her death.

{¶32} Moreover, with regard to proximate cause, the magistrate further finds that defendant's experts presented competent, credible evidence to rebut the coroner's finding that Camara's cause of death was a massive sickling of cells. *See Vargo v. Travelers Ins. Co., Inc.*, 34 Ohio St.3d 27 (1987), paragraph one of the syllabus (holding that a coroner's findings are non-binding and may be rebutted by competent, credible evidence.) Defendant's experts' testimony persuades the magistrate to find that the massive sickling of red blood cells was more likely than not a result of her death, not the proximate cause of it. For the foregoing reasons, the magistrate finds that plaintiff has failed to prove his claim of wrongful death by a preponderance of the evidence, and judgment is recommended in favor of defendant.

{¶33} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
HOLLY TRUE SHAVER
Magistrate

cc:

Chris C. Tsitouris                          Daniel R. Forsythe
150 East Mound Street, Suite 206            Assistant Attorney General
Columbus, Ohio 43215-5429                   150 East Gay Street, 18th Floor
                                            Columbus, Ohio 43215-3130

**Filed February 13, 2015**
**Sent To S.C. Reporter 12/31/15**